UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY JEAN
WERTHMANN,

                              Case No. 2:17-cv-10598

        Plaintiff,        District Judge Stephen J. Murphy, III

                              Magistrate Judge Anthony P. Patti

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART PLAINTIFF'S AND DEFENDANT'S RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT (DE 11, 14), AFFIRM THE ALJ'S DECISION IN PART AND REMAND TO THE COMMISSIONER FOR FURTHER PROCEEDINGS

**I.**     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT IN PART AND DENY IN PART**

Plaintiff's and Defendant's respective motions for summary judgment (DE 11, 14),

**AFFIRM IN PART** the ALJ's decision and **REMAND** this matter to the

Commissioner for further action consistent with this report.

**II.**     **REPORT**

       Plaintiff, Nancy Jean Werthmann, brings this action under 42 U.S.C. §

405(g) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for disability insurance (DI) and

supplemental security income (SSI) benefits.  This matter is before the United

States Magistrate Judge for a Report and Recommendation on Plaintiff's motion

for summary judgment (DE 11), the Commissioner's cross-motion for summary

judgment (DE 14), and the administrative record (DE 9).

### A.    Background and Administrative History

Plaintiff alleges her disability began on February 14, 2013, at the age of 52.

(R. at 127.)  She lists "bipolar I disorder, with psychotic features" as limiting her

ability to work.  (R. at 156.)  Her applications for DI and SSI benefits were denied

on May 28, 2014.  (R. at 57-84.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R.

at 88-89.)  ALJ Jerome Blum held a hearing, and, on December 28, 2015,

determined that Plaintiff was not disabled within the meaning of the Social

Security Act.  (R. at 9-56.)  On January 11, 2017, the Appeals Council denied

Plaintiff's request for review.  (R. at 1-8.)  Thus, ALJ Blum's decision became the

Commissioner's final decision.

Plaintiff timely commenced the instant action on February 24, 2017.  (DE 1.)

### B.    Plaintiff's Medical History

The administrative record contains approximately 233 pages of medical

records, all of which were available to the ALJ at the time of his December 28,

2015 decision.  (R. at 24, 220-452 [Exhibits 1F-3F].)  These records will be discussed in detail, as necessary, below.

### C.   Hearing Testimony

#### 1.   Plaintiff's Testimony

Plaintiff testified at the October 29, 2015 hearing, when she was 55 years old.  (R. at 28-48.)  As Plaintiff is not expressly challenging the ALJ's credibility assessment in the instant appeal, the Court will forego further summary of her testimony here and will only refer to it as necessary below.

#### 2.   Vocational Expert Testimony

Vocational expert (VE) Michael E. Rosko testified at the hearing, providing detailed information about Plaintiff's past work as a teller (200,000 such jobs nationally), a loan representative (80,000 such jobs nationally) and a legal assistant (135,000 such jobs nationally).  Still, when asked to factor in Plaintiff's testimony "as to primarily her emotional state of mind," or when asked about being "off task for 20 percent of the time," the VE testified that such an individual would not be able to perform those jobs.  (R. at 48-55, 210-211, 215.)

### D.   The Administrative Decision

On December 28, 2015, ALJ Blum issued his decision.  (R. at 9-24.)  At **Step 1** of the sequential evaluation process,[1] the ALJ found that Plaintiff had not

---

[1] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

engaged in substantial gainful activity between February 14, 2013 and December 31, 2014.  (R. at 14.)  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  mood disorder and polysubstance dependence.  (R. at 14-15.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (R. at 15-16.)  Between **Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[2] and determined that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the non-exertional limitations of "simple, routine, and repetitive tasks."  (R. at 16-18.)  At **Step 4**, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (R. at 18-19.)  At **Step 5**, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  (R. at 19.)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 14, 2013 through December 31, 2014.  (*Id*.)

### E.    Standard of Review

---

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

F.    **Analysis**

1.    **The severity of Plaintiff's bipolar disorder with psychotic tendencies**

At Step 2, the ALJ determined that Plaintiff's mood disorder and polysubstance dependence were severe impairments, as these conditions "cause significant limitations in the claimant's ability to perform basic work activities." (R. at 14.)  However, the ALJ further determined that Plaintiff's bipolar disorder with psychotic tendencies, right knee bursitis, psoriasis, and history of thyroid nodules were "nonsevere," explaining as follows:

> The undersigned finds all impairments other than those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment,

6

cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to result in more than minimal work-related restriction for a *continuous period of at least 12 months*, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source as defined in the regulations (20 CFR 404.1509, 404.1513(a), 404.152l(a), 416.909, 416.913(a), and 416.92l(a)).

(R. at 15 (emphasis added).)

In challenging the ALJ's *Step 2* decision as to Plaintiff's "bipolar disorder with psychotic tendencies," Plaintiff points to the ALJ's conclusion at *Step 3* that "the claimant has experienced one episode[] of decompensation, which was of extended duration." (DE 11 at 18, R. at 15.)[3] While the ALJ did not specify this episode of decompensation, the Court suspects it is a reference to the Plaintiff's seven-month stay (August 2, 2013 - March 6, 2014) at the Center for Forensic Psychiatry (CFP), although Plaintiff contends this decompensation episode lasted for the more than *12 month* period "from February 2013" (the month of her alleged onset date and in which she experienced mental health exacerbation and was *arrested*) until Plaintiff's "release from the psychiatric facility on March 6, 2014." (DE 11 at 18, 11, R. at 235, 28.)

Plaintiff's assertion about her decompensation episode does not illustrate with which portion of the ALJ's Step 2 reasoning she takes issue, such as the

---

[3] By comparison, on May 28, 2014, state agency consultant Jerry Csokasy, Ph.D. opined that Plaintiff had no "Repeated Episodes of Decompensation, Each of Extended Duration[.]" (R. at 60-61.)

ALJ's descriptions of Plaintiff's "bipolar disorder with psychotic tendencies" as having been "responsive to treatment" and/or not having been "properly diagnosed by an acceptable medical source . . . ."  (R. at 15.)  The Court notes that the MCCMH's July 3, 2013 "initial intake" lists Plaintiff's primary diagnosis as "Major[]depressive disorder, single, severe w/psych," with an "active" status; but, it also lists Plaintiff's secondary diagnosis as "Bipolar I disor, single manic epis, severe w/psych," with a "rule out" status.  (R. at 340.)  Also, Sharon Dodd-Kimmey, M.D.'s August 2, 2013 admitting psychiatric diagnoses included "Bipolar Disorder – provisional diagnosis," and her March 19, 2014 discharge diagnoses included "Bipolar disorder, NOS[,]" *i.e.*, "not otherwise specified." (R. at 226, 234.)  Meanwhile, by the time of the February 11, 2014 annual assessment, some diagnoses had been ruled out, and the above-described bipolar diagnosis was listed as primary, although still in a "rule out" status.  (R. at 320.)  It appears to have remained in this state through August 3, 2015.  (R. at 349; *see also* R. at 301, 296, 356, 363, 371, 383, 395, 406, 416, 427, 436, 444, 452.)  In other words, it does not appear that this diagnosis was ever definitively made.

However, even if the February 22, 2013 event was considered to be a "psychotic episode," (R. at 235), and even if the events at MCJ were "residual symptoms of a recent psychotic episode[,]" (R. at 259), on August 2, 2013, less than six months after the episode, Plaintiff "denied experiencing any recent

8

psychotic symptoms." (R. at 225-226; *see also* R. at 232.) Moreover, in records dated June 3, 2014 through August 3, 2015, there are several references to "no active psychotic sx's" (R. at 345, 352) or "no psychotic symptoms were evident" (R. at 359, 366)[4] or "no anxiety or psychotic signs or symptoms" (R. at 373, 385, 396) or "no evidence of psychotic thinking" (R. at 407, 418, 437). Thus, the ALJ may have considered this "condition" to have "stabilized on medication." (R. at 15.)

Plaintiff not having shown a reversible error in the ALJ's Step 2 conclusion, it should stand. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("during the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five.").

### 2. The mental RFC of "simple, routine, and repetitive tasks"

### a. Background (February 2013 - March 1, 2013)

Plaintiff claims that she "experienced an episode of delusional mental health exacerbation on February 22, 2013." (DE 11 at 20.) According to Plaintiff's medical records, on February 22, 2013, she was arrested for felonious assault and weapons assault and incarcerated. (R. at 260, 298, 300, 330.) It seems that she went to the Macomb County Jail (MCJ) on February 27, 2013. (R. at 258, 267,

---

[4] From February 2014 through December 2014, there are also several notations of "no psychic symptoms were evident," which are also likely references to "psychotic symptoms." (R. at 296, 301, 320, 383, 395, 406, 416, 427, 436, 444, 452.)

273, 280.)  Records show that, on March 1, 2013, allegedly while incarcerated at MCJ, Plaintiff "assaulted a deputy with a cleaning mop."  (R. at 297, 309, 310, 312, 322.)  It appears that Plaintiff remained at the MCJ until around March 8, 2013, at which time she was thought to be "stable enough to be housed with other inmates on the mental health unit . . . [.]"  (R. at 260, 269, 275, 283.)

In association with state court criminal charges, Elizabeth Toplyn, Ph.D. opined that Plaintiff was competent to stand trial but met the statutory criteria for a claim of legal insanity.  (R. at 271, 277, 285.)  Dr. Toplyn later opined that Plaintiff met the statutory criteria for a claim of legal insanity "on all three charges."  (R. at 265.)  The ALJ assigned Dr. Toplyn's opinions "great weight" as to Plaintiff's "mental health condition on February 22, 2013 through March 1, 2013."  (R. at 17.)

### b.    March 2, 2013 - August 1, 2013

Plaintiff takes issue with the ALJ's conclusion that "the claimant's condition greatly improved after March 1, 2013[,]" pointing out that, while "there was some improvement . . . [,]" Plaintiff remained in jail until her trial, at the conclusion of which she was found "not guilty by reason of insanity and immediately committed to the [CFP]."  (DE 11 at 18.)

While the Court recognizes Plaintiff's seven-month stay at CFP, this portion of her argument does not cite to any records dated March 2, 2013 through August

1, 2013 that dispute the ALJ's determination.  The records suggest that, on May 15, 2013, Plaintiff was released from jail.  (R. at 331, 340, 342.)  On July 3, 2013, approximately one month before she was admitted to CFP, Plaintiff underwent an "initial intake" with Teresa Bentley LPC-HNNP of Macomb County Community Mental Health (MCCMH).  (R. at 324-343.)  As noted above, the primary diagnosis was active major depressive disorder "single, severe w/psych[,]" with a secondary diagnosis to "rule out" bipolar I disorder, "single manic epis, severe w/psych."  (R. at 340.)

### c.    The CFP (August 2, 2013 -March 6, 2014)

On August 2, 2013, Plaintiff was found not guilty by reason of insanity on charges of felonious assault, weapon offense, and assault on a prison employee and was directly admitted to the CFP.  (R. at 222-231, 237-242.)  At the time of her admission, Dr. Dodd-Kimmey described Plaintiff's mental status as follows:

> Ms. Werthmann appeared as a well-developed, well-nourished, woman.  Her hygiene and self-care skills were good.  She displayed no abnormal or involuntary motor movements.  She was compliant, pleasant, engaging, and polite.  She showed good eye contact.  There was no disturbance in her speech, thought process, or thought content.  Her mood was described as good.  Her affect was congruent.  She did not display any signs of mood swings.  While she expressed some apprehension about generalized anxiety, she denied having panic attacks.  She denied any suicidal, aggressive or homicidal thoughts.  She denied experiencing any recent psychotic symptoms.  She was fully oriented and there was no evidence of mental confusion.

11

(R. at 225-226.)  During her stay at CFP, Plaintiff's blood was monitored.  (R. at

243-252.)  Kathleen Regan LMSW and/or Marianne Frazho LMSW performed an

annual assessment on February 11, 2014, which, among other things, noted:

> Since Ms. Werthmann's admission to the Center for Forensic
> Psychiatry she has been cooperative with staff, attends all unit PSR
> classes, is medication compliant, is coherent and relevant, mood is
> "good" and affect is appropriate, there is not active symptom of a
> mental condition, she follows all rules on the unit, and no odd
> behavior or cognitive deficits have been noted.  Her treating
> psychiatrist as well as team members are recommending that she be
> released to the community to reside with her daughter and ex husband
> in her ex husband's home in Clinton Township. There is no need for
> residential placement for Ms. Werthmann.  Writer concurs, based
> upon face to face assessment, discussion with her CFP treatment staff
> as well as review of available records.

(R. at 303-323.)  On March 6, 2014, Plaintiff was discharged, at which time Dr.

Dodd-Kimmey noted, among other things, that:  **(a)** Plaintiff "was a model

patient[;]" **(b)** her "mental status . . . was similar to that at the time of her

admission," with the "noted exception" that Plaintiff "appeared markedly less

anxious[;]" and **(c)** her "prognosis is good."  (R. at 233-234.)

### d.    Post-hospitalization (March 7, 2014 - May 28, 2014)

On March 11, 2014, Natraj Sitaram, M.D., performed a psychiatric

evaluation, at which point the "Bipolar I disor, single manic epis, severe w/psych"

diagnosis was primary but still in a "rule out" status.  (R. at 301.)  It remained the

same at the April 8, 2014 medication review.  (R. at 296.)

      **e.**      **The ALJ's treatment of state agency consultant Jerry
Csokasy, Ph.D.'s May 28, 2014 opinion**

At Step 3, the ALJ found that Plaintiff has moderate difficulties with regard to concentration, persistence or pace (CPP) and was "limited to simple, routine, and repetitive tasks." In so doing, the ALJ explained:

> Although the claimant has a history of mental health exacerbation, her condition was stabilized on medication. She continues to perform a full-range of activities of daily living that evidences retained capacity for [CPP]. The evidence of record supports no more than moderate difficulties in this domain.

(R. at 15.) Between Steps 3 and 4, the ALJ's assessed a mental RFC of "simple, routine, and repetitive tasks." (R. at 16.) In arriving at this conclusion, the ALJ expressly cited the May 28, 2014 opinion of state agency consultant Jerry Csokasy, Ph.D., who opined that Plaintiff "is able to perform simple/routine tasks on a sustained basis." (R. at 18, 63, 72.) The support for this conclusion appears to have been, at least:

- the mental status portion of Dr. Dodd-Kimmey's August 28, 2013 psychiatric admission summary (R. at 225);

- Dr. Dodd-Kimmey's March 19, 2014 discharge summary (R. at 230, 233-234); and,

- the diagnostic summary within Natraj Sitaram, M.D.'s April 8, 2014 medication review notes (R. at 296).

(R. at 61, 70.) In addition, Dr. Csokasy considered Dr. Toplyn's May 15, 2013 letter (R. at 253-265). (R. at 59, 68.) The ALJ assigned Dr. Csokasy's opinion

"great weight based upon his expertise, impartiality, and the consistency of his

opinions with the evidence as a whole[,]" although the ALJ rejected Dr. Csokasy's

opinion that Plaintiff was moderately limited in social functioning.  Plaintiff does

not take issue with the manner in which the ALJ weighed this opinion. Thereafter,

the ALJ summarized:

> Based upon the evidence as a whole, the claimant is found to be
> limited to a reduced range of work.  She has a history of psychotic
> mental health exacerbation related to prescription drug and marijuana
> abuse.  However, she has received consistent treatment since the onset
> of severe symptoms and her condition has stabilized.  In fact, the
> claimant returned to full-time work in 2015.  Therefore, the claimant
> is found to have retained sufficient capacity to perform simple,
> routine, and repetitive tasks.

(R. at 18.)

### f.    Plaintiff's RFC "prior to May 28, 2014"

Plaintiff asserts that the evidence of record does not support the conclusion

that Plaintiff had the RFC to perform "simple, routine, and repetitive tasks" prior to

May 28, 2014.  (DE 11 at 18.)  Citing the ALJ's Step 3 analysis of the "Paragraph

B" criteria of "activities of daily living" and "social functioning," which referenced

Plaintiff's May 11, 2014 function report (R. at 15, 180-187), Plaintiff contends that

the ALJ was "assessing . . . plaintiff's abilities *after discharge* from the psychiatric

hospital[.]"  (DE 11 at 19 (emphasis added).)  Plaintiff also contends that, at the

hearing, the ALJ did not inquire about "symptoms *during her psychiatric

hospitalization*[,]" but focused on "the period *after discharge* from the hospital."

14

(DE 11 at 19-20 (emphases added).)  Elsewhere, she states that, "at the very least, [she] was unable to perform work in a competitive work setting for a time period spanning February 14, 2013 [her alleged onset date] through March 2014."  (DE 11 at 21.)

Plaintiff claims that "the medical evidence of record clearly demonstrates that the Plaintiff was not able to perform work in a competitive work setting until at least March 6, 2014, when she was released from the psychiatric hospital."  (DE 11 at 19.)  Although an introductory portion of Plaintiff's brief cites the July 3, 2013 initial intake notes from MCCMH, the August 12, 2013 notes from Natasha R. Clark, LMSW, Dr. Dodd-Kimmey's August 28, 2013 admission summary, and the February 11, 2014 annual assessment (DE 11 at 12; R. at 222, 226, 231, 320-323, 333, 340, 342, 416), it is nevertheless unclear to the Court upon which CFP-era records Plaintiff relies in her challenge to the ALJ's RFC determination. This is so, even though her statement of error generally references the "regular mental health treatment" at MCCMH, which could be any one of approximately 167 pages of records ranging from July 3, 2013 through August 3, 2015.  (DE 11 at 21, 286-452.)  Moreover, if, in citing Dr. Sitaram's "March 6, 2014" notes, Plaintiff instead intended to refer to Dr. Sitaram's notes from the March 11, 2014 psychiatric evaluation, the listed diagnosis of bipolar 1 disorder "single manic epis, severe w/psych[,]" was still in a "rule out" status.  (DE 11 at 21, R. at 301.)  Also, such a

citation does not show how Plaintiff was incapable of performing "simple, routine, and repetitive tasks."  (R. at 16.)

> ### g.    Evidence post-dating Dr. Csokasy's assessment (May 29, 2014 - December 31, 2014)

Plaintiff continued treatment with MCCMH from May 6, 2014 through August 3, 2015.  (R. at 344-452 [Exhibit 3F].)  As the Commissioner acknowledges, Dr. Csokasy would not have considered these treatment notes at the time of his May 28, 2014 opinion.  (DE 14 at 15.)  Nonetheless, Plaintiff is seeking disability for a closed period through October 2014 (per her counsel's brief here) or December 31, 2014 (per her counsel's brief before the ALJ).  (DE 11 at 7-8; R. at 214.)[5]

To the extent Plaintiff intended to argue that any document within Exhibit 3F supports a conclusion that she is unable to perform "simple, routine, and repetitive tasks[,]" (R. at 16), the basis for her argument is unclear and it was her burden to provide the clarification.  Indeed, while the introductory portion of Plaintiff's brief cites several records from the period of June 3, 2014 through December 9, 2014 (DE 11 at 12-13, R. at 373, 385, 396, 416, 437), these citations

---

[5] The ALJ used the December date.  (R. at 12, 14, 19.)  Plaintiff claims she "obtained employment in December 2014[,]" and "returned to full time work in August 2015." (DE 11 at 8, 21; R. at 207.)  It appears that Plaintiff was working full time at least as of December 9, 2014.  (R. at 345-346, 352, 366, 373).

do not appear to be referenced in her RFC statement of error. (R. at 18-21.)[6]

Perhaps this is so, because, even though the closed period for which Plaintiff seeks

benefits concluded (at the latest) on December 31, 2014, this statement of error

twice asserts disability "until at least March 6, 2014," or "through March 2014."

(DE 11 at 19, 21.) The lack of precision and inconsistencies in Plaintiff's

argument not only unnecessarily tax this Court's efforts to review the decision in

question but also fail to meet Plaintiff's burden to demonstrate reversible error.

Plaintiff not having shown a reversible error in the ALJ's mental RFC of "simple,

routine, and repetitive tasks," and the ALJ's decision being demonstrably based on

substantial evidence (R. at 15, 18), it should stand. *Walters*, 127 F.3d at 529.

### 3. Step 5 of 20 C.F.R. § 404.1520's sequential evaluation process

#### a. Medical-Vocational Guidelines Section 204.00 and the limitation to "unskilled work at all exertional levels"

At Step 4, the ALJ determined that Plaintiff was unable to perform any past

relevant work, expressly noting that these positions were skilled. (R. at 18.) At

Step 5, in determining that there are jobs that exist in significant numbers in the

national economy that Plaintiff could have performed, the ALJ noted:

> The claimant's ability to perform work at all exertional levels has been
> compromised by nonexertional limitations. However, these

---

[6] Plaintiff also cites the records from March 31, 2015. (DE 11 at 13, R. at 366, 371.) However, these post-date the closed period for which she seeks disability benefits.

> limitations have little or no effect on the occupational base of
> *unskilled* work at all exertional levels.  A finding of "not disabled" is
> therefore appropriate under the framework of section 204.00 in the
> Medical-Vocational Guidelines.

(R. at 19 (emphasis added).)

"Where a claimant has solely nonexertional impairments, unskilled jobs at all levels of exertion make up the potential occupational base." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) (citing SSR 85–15, 1985 WL 56857, *4).  "The basic mental demands of competitive, remunerative, unskilled work include . . .

> . . . the abilities (on a sustained basis) to understand, carry out, and
> remember simple instructions; to respond appropriately to
> supervision, coworkers, and usual work situations; and to deal with
> changes in a routine work setting. A substantial loss of ability to meet
> any of these basic work-related activities would severely limit the
> potential occupational base. This, in turn, would justify a finding of
> disability because even favorable age, education, or work experience
> will not offset such a severely limited occupational base.

SSR 85-15, 1985 WL 56857, *4 (S.S.A. 1985).  Indeed, Plaintiff seems to recognize that the ALJ's Step 5 determination was based on the Medical-Vocational Guidelines and a conclusion that Plaintiff's nonexertional limitations "have little or no effect on the occupational base of *unskilled* work at all exertional levels."  (DE 11 at 14, R. at 19.)

Effectively, as the Commissioner notes, "the ALJ simply found that Plaintiff could do unskilled work at any exertional level."  (DE 15 at 19.)  *See Allison v.*

*Apfel*, 229 F.3d 1150 (6th Cir. 2000) ("We believe that the ALJ's qualification that Allison was limited to simple, repetitive, and routine tasks, within the category of light work, simply means that Allison is limited to unskilled light work."). Thus, Plaintiff's argument that the ALJ "did not continue the evaluation process through [S]tep 5[,]" is unavailing. (DE 11 at 13.)

### b.   Moderate CPP

Based on her case law citations, Plaintiff seems to further argue that moderate limitations with respect to CPP (as the ALJ found in this case at Step 3) are not automatically accounted for by a limitation to "unskilled work." (DE 11 at 16, R at 15.) *See Bonham-Conn v. Comm'r of Soc. Sec.*, No. 08-13248, 2009 WL 3211000, at *6 (E.D. Mich. Sept. 29, 2009) ("substantial evidence does not support the ALJ's conclusion that [Plaintiff] could perform such work despite his moderate limitations in concentration, persistence, or pace because the ALJ's questions to the VE did not fully account for these limitations."); *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007) ("the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations.");

*Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930-931 (E.D. Mich. 2005) ("The

current hypothetical question is not adequate on the issue of moderate limitations

of concentration, persistence and pace for this Court to have any idea as to the

number of the assembly, packing, and sorting or security guard jobs identified by

the VE that would be excluded if quotas or other aspects related to moderate

concentration limitations were added to the hypothetical question.").[7]  If so, it is

somewhat buried in Plaintiff's brief and not terribly well developed.  (*See* DE 11 at

16.)

      At the same time, the Commissioner would bear the burden on such an

argument, and she has failed to address it.  (*See* DE 14 at 15-16).  True, Dr.

Csokasy opined that Plaintiff was "not significantly limited" in her "ability to

complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods."  (R. at 63, 72.)  Moreover, it is

possible the limitation to unskilled work suffices here, where the ALJ found that

Plaintiff's CPP limitations were "moderate" but, in so doing, noted that Plaintiff

"continues to perform a full-range of activities of daily living that evidences

retained capacity for concentration, persistence, and pace."  (R. at 15).  *Compare*

---

[7] S*ee also, Lewicki v. Comm'r of Soc. Sec*., No. 09-11844, 2010 WL 3905375, at *3
(E.D. Mich. Sept. 30, 2010) (noting that "[d]ecisions in this district reflect the
conclusion that a moderate impairment in concentration, persistence, and pace does
not necessarily preclude simple, routine, unskilled work.")

*Bonham-Conn v. Comm'r of Soc. Sec.*, No. 08-13248, 2009 WL 3211000, at \*7
(E.D. Mich. Sept. 29, 2009) ("Because the ALJ's hypothetical question to the VE
did not fully reflect [Plaintiff]'s concentration, persistence, and pace limitations, it
does not constitute substantial evidence that there were jobs in the national
economy for an individual with [Plaintiff]'s limitations.").  Nonetheless, as outlined
below, the failure of the ALJ to inquire about Plaintiff's non-exertional limitations
("simple, routine, and repetitive tasks") within the hypothetical warrants remand in
this case.

### c. A mental RFC of "simple, routine, and repetitive tasks," and the accuracy of the hypothetical

Plaintiff also seems to challenge the accuracy of the hypothetical.  (DE 11 at
15, 17, 21.)  Once the ALJ had examined the VE on Plaintiff's past work (as a
teller, loan representative, legal assistant, each of which was skilled) (R. at 48-55),
the following exchange took place:

> Q  Okay.  If we factor in the claimant's *testimony* as to primarily
> her emotional state of mind that she's described for us.  At the time
> she was using illegal drugs, marijuana, the time she spent in
> incarceration, going through a divorce, a separation during this period
> of time, feelings of paranoia, difficulty trusting people, would she be
> able to work in any of these jobs that you just talked about?
>
> A  No.

(R. at 55 (emphasis added).)  Oddly, the ALJ's inquiry came to a complete halt
after this question.

21

Plaintiff points out that:  **(a)** the ALJ's hypothetical to the VE did not include a limitation of "simple, routine, and repetitive tasks," which was a part of the RFC (*see* R. at 16); **(b)** the VE's testimony as to the hypothetical was that Plaintiff would not have been able to perform the positions discussed; and **(c)** the VE was not asked about other work that Plaintiff may have been able to perform or "what if any work the plaintiff could perform based upon her testimony."  (DE 11 at 14-15; R. at 48-55.)  I acknowledge, as I have in the past, that, "Courts in this district have emphasized the need for a case-by-case analysis when assessing whether a limitation to unskilled work adequately accounts for a CPP deficiency[,]" and that an "ALJ's hypothetical 'need not incorporate a listing of the claimant's medical conditions[.]'"  *Bickerstaff v. Comm'r of Soc. Sec.*, No. 2:15-CV-10917, 2016 WL 4182756, at *12 (E.D. Mich. July 15, 2016) (Patti, M.J.), *report and recommendation adopted*, No. 15-10917, 2016 WL 4158383 (E.D. Mich. Aug. 5, 2016) (Lawson, J.) (citing various cases and quoting *McNamara v. Comm'r of Soc. Sec.*, No. CIV.A. 11-10331, 2011 WL 7025855, at *12 (E.D. Mich. Dec. 1, 2011) *report and recommendation adopted*, No. 11-10331, 2012 WL 113541 (E.D. Mich. Jan. 13, 2012)).  However, in this particular case, I am unable to tell whether "the vocational expert's testimony . . . take[s] into account the claimant's functional limitations[.]"  *Infantado v. Astrue*, 263 F. App'x 469, 476 (6th Cir. 2008).  Nor, given the ALJ's terse examination of the VE, can

the Court tell what exactly the ALJ considered, did not consider, or accredited in making his Step 5 findings.  The Court therefore cannot agree, without more, that the limitation to unskilled work accounts for Plaintiff's mental RFC of "simple, routine, and repetitive tasks."[8]

### d.    20 C.F.R. § 404.1520a(c) and recap

Finally, Plaintiff contends that the ALJ did not assess mental limitations in accordance with 20 C.F.R. § 404.1520a(c) ("Rating the degree of functional limitation.").  (DE 11 at 17.)  To the extent this assertion is a challenge to the ALJ's Step 3 assessment of Plaintiff's functional limitations, such as the conclusion of "moderate difficulties" with respect to CPP (R. at 15), Plaintiff has failed to show how the ALJ erred at that stage of the sequential process.  If Plaintiff is attempting to attack the ALJ's resulting mental RFC of "simple, routine, and repetitive tasks," (R. at 15, 16, 18), it fails for the reasons stated above in Section II.F.2 of this report.  However, to the extent that it is an attempt to challenge the ALJ's Step 5 determination based on the omission of Plaintiff's

---

[8] In assessing Plaintiff's mental RFC, the ALJ determined that Plaintiff "not entirely credible," and subsequently explained she was "partially credible," in language identical to that employed by Dr. Csokasy.  (R. at 17-18, 62, 71.)  To the extent Plaintiff claims there is no testimony about the impact of Plaintiff's "emotional state of mind" upon her ability to perform "other work," (DE 11 at 15), her argument is undeveloped, without any citation to the applicable regulation 20 C.F.R. § 404.1529 ("How we evaluate symptoms, including pain."), or a related Social Security Ruling, such as SSR 96-7p (July 2, 1996), which was superseded by SSR 16-3p (Oct. 25, 2017).

moderate CPP limitations from the hypothetical posed to the VE (R. at 19, 55), I agree, for the reasons stated in Section II.F.3.c of this report, that it remains unclear whether (a) the limitation to unskilled work will suffice to account for Plaintiff's moderate CPP deficiencies and (b) someone with her limitations could perform sustained work in the national economy.

### G. Conclusion

In sum, Plaintiff has not shown reversible error in the ALJ's Step 2 determination of "nonsevere bipolar disorder with psychotic tendencies." Nor has Plaintiff shown reversible error in the ALJ's mental RFC of "simple, routine, and repetitive tasks." However, Plaintiff has shown gaps at Step 5 which require remand, namely, incomplete hypotheticals to the VE which make it difficult for this Court to discern whether there were jobs that could be performed by someone with Plaintiff's limitations. Accordingly, it is **RECOMMENDED** that the Court **GRANT IN PART AND DENY IN PART** Plaintiff's and Defendant's respective motions for summary judgment (DE 11, 14), **AFFIRM IN PART** the ALJ's decision and **REMAND** this case to the ALJ for further consideration consistent with this report and recommendation. On remand, *inter alia*, the ALJ should: **(1)** address **(a)** Plaintiff's ability to sustain work and complete tasks in an acceptable time period, **(b)** her overall functional performance, and, **(c)** include this information in one or more hypothetical questions to the VE; **(2)** explore through

the VE's testimony whether there are jobs available in the national economy for someone with Plaintiff's limitations in concentration, persistence and pace; **(3)** ask the VE "what if any work the plaintiff could perform based upon her testimony[,]" (DE 11 at 14-15; R. at 48-55); and, **(4)** support and explain why the limitation to unskilled work suffices here to account for Plaintiff's functional limitations, if it does.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  February 21, 2018        s/Anthony P. Patti
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 21, 2018, electronically and/or by U.S. Mail.

                                 s/Michael Williams
                                 Case Manager to the
                                 Honorable Anthony P. Patti